**IN THE COURT OF APPEALS OF IOWA**

No. 15-0578
Filed May 25, 2016

**IN RE THE MARRIAGE OF LAURA GEIST
AND MARK GEIST**

**Upon the Petition of**
**LAURA GEIST, n/k/a LAURA FRAZIER,**
        Petitioner-Appellee/Cross-Appellant,

**And Concerning**
**MARK GEIST,**
        Respondent-Appellant/Cross-Appellee.
_____


        Appeal from the Iowa District Court for Scott County, Stuart P. Werling,

Judge.


        Former husband and wife contest the property distribution and economic

provisions of the decree dissolving their marriage.  **AFFIRMED AS MODIFIED.**


        Nathan M. Legue of Cartee & McKenrick, P.C., Davenport, for appellant.

        Wendy S. Meyer of Lane & Waterman, LLP, Davenport, for appellee.


        Considered by Vaitheswaran, P.J., and Doyle and Mullins, JJ.

**DOYLE, Judge.**

Mark Geist appeals and Laura Frazier (formerly Geist) cross-appeals from the decree dissolving their marriage. The parties contest the district court's overall property division, including its property valuations and the percentage of those valuations it included as marital assets. Additionally, Mark challenges the court's awards of permanent spousal support and trial attorney fees to Laura, and Laura contends the court erred in not ordering Mark to purchase or maintain a life-insurance policy for her benefit, in failing to include a specific hold-harmless clause, and in not allowing her additional time to remove her personal property from the marital home. She requests appellate attorney fees. Upon our de novo review, we affirm as modified.

### I. Background Facts and Proceedings.

Mark and Laura Geist married in 1998. They have no children. In April 2014, Laura filed a petition seeking to dissolve their marriage.

In August 2014, the district court filed its "Trial Setting Conference Memorandum," indicating spousal support, property, debts, and attorney fees were issues "that may be contested" at trial, and it set a trial date for February 2015.

Trial was held as scheduled. At the start, the district court stated:

> The parties have signed and presented to the court, prior to going on the record, a statement of uncontested and contested issues, which the court has received, and a joint statement of assets and liabilities.
> Although the joint statement of assets and liabilities is signed by the parties, the . . . petitioner has informed the court that there may be some modification regarding bank account numbers once the evidence is received.

The court then asked the parties if there was "anything else preliminarily we need to do . . . ?" Both parties' attorneys answered in the negative, and the testimony began. Ultimately, neither the statement of the parties' uncontested and contested issues nor the joint statement of assets and liabilities made it into the record.

On March 5, 2015, the district court entered its order and ruling dissolving the parties' marriage. The court set forth the following assets as marital property, and it assigned valuations and distributed the property as follows:[1]

| PETITIONER'S VALUES | Court's Value | Mark | Laura |
|---|---|---|---|
| [Homestead] | $255,300.00 | $127,650.00 | $127,650.00 |
| [Rental] | $190,970.00 | $152,776.00 | $38,194.00 |
| 2000 [car] | $2,000.00 | | $2,000.00 |
| 2011 [truck] | $20,900.00 | $20,900.00 | |
| Boat & Trailer | | $1,500.00 | |
| Horse Trailer | | $500.00 | |
| [Pick-up] | $1,500.00 | $1,500.00 | |
| Work Trailer | | $350.00 | |
| [CMFG Insurance] | $5,455.00 | $5,455.00 | |
| [NW Mutual Insurance] | $26,473.00 | $26,473.00 | |
| Prudential | | | |
| [BF] Stock | $56,333.67 | $56,333.67 | |
| [Bank[2]] CD | $64,552.07 | $64,552.07 | |
| [Bank] RENTAL DEPOSIT | $1,500.00 | $1,500.00 | |
| [Bank] | $14,847.77 | $14,847.77 | |
| [Bank] | | | $300.00 |
| [Bank] | $63,221.12 | $31,610.56 | $31,610.56 |

---

[1] We set forth the table as it was presented in the decree except for the alterations indicated in brackets.

[2] We substituted "Bank" for the actual name of the parties' bank listed in the table of the district court's decree. Other than that name, we did not omit or alter any information concerning the accounts. Stated another way, but for "CD" and "RENTAL DEPOSIT," the district court did not otherwise identify which account it was referring to when it listed a valuation on each "Bank" line, nor did it further explain in its decree how it arrived at its valuations. Some of the figures are straightforward and correspond to evidence in the record, but we are unable to determine how it arrived at the values of $64,552.07 and $14,847.77.

| [Bank] | $1,500.00 | $750.00 | $1,500.00 |
|---|---|---|---|
| [Bank] | $29,532.00 | | |
| [Bank] | | | |
| [Bank] | | | |
| Guns & Safe | $2,300.00 | $2,300.00 | |
| Shop Contents | $25,000.00 | $25,000.00 | |
| Tractor | $17,413.60 | $17,413.60 | |
| Appliances | $1,500.00 | $1,500.00 | |
| Furniture | $5,000.00 | $5,000.00 | |
| *subtotal* | | $557,911.67 | $201,254.56 |

The court noted the distribution netted Mark $356,657.11 over the assets awarded to Laura. The court also found the "total marital debt [was] about $20,000," and it ordered Mark to pay "all marital debt as identified in the joint statement of assets and liabilities." To give Mark credit for the marital debt it ordered him to pay, the court subtracted $20,000 from the $356,657.11 property award differential, rounded it off to $337,000, divided it in half, and ordered Mark pay an equalization payment to Laura of $168,500.

The court found "Mark earn[ed] approximately $92,000 and Laura $22,500 per year in gross income" and ordered Mark to pay Laura permanent spousal support of $1100 per month. Mark was also ordered to pay $12,000 of Laura's attorney fees. The court declined Laura's request for additional time to remove her property from the marital property.

Thereafter, Laura filed an Iowa Rule of Civil Procedure 1.904(2) motion requesting that the court enlarge or amend its decree in numerous respects. Among other things, Laura requested the court amend the decree to require Mark to maintain life insurance for her benefit to secure her spousal support. She also requested the court amend the decree to include a hold-harmless

clause concerning the parties' past tax returns, and she asked for additional time to remove her property from the marital home.

At this point, the court became aware it did not have the parties' joint statement, and at the court's request, the parties resubmitted the statement on March 18, 2015. The undated statement, which was signed only by the parties' attorneys, is as follows:[3]

| ASSETS | OWNER | Agreed Recipient | Agreed Value | Values [Laura] | Values [Mark] |
|---|---|---|---|---|---|
| [Homestead] | J | | $255,300.00 | | $217,300.00 |
| [Rental] | D | | $190,970.00 | | |
| .54 Acres* | J | | | $3,000.00 | $3,000.00 |
| 9.52 Acres | J | | | $35,000.00 | $35,000.00 |
| 2000 [car] | W | | $2,000.00 | $2,000.00 | $2,000.00 |
| 2011 [truck] | H | | | | $19,946.00 |
| Boat & Trailer* | H | | | | $3,000.00 |
| 2012 [tractor] | H | | $26,600.00 | | |
| Horse Trailer* | H | | | $1,000.00 | $800.00 |
| [Pick-up] | H | | $1,500.00 | | $1,500.00 |
| Work Trailer | H | | | $5,000.00 | $1,500.00 |
| [CMFG Insurance]* | H | | $5,455.95 | $5,455.95 | $5,455.95 |
| [Mutual Insurance]* | H | | $26,473.13 | $26,473.13 | $26,473.13 |
| Prudential (term) | W | | $0.00 | | |
| [BF Stock] | H | | | $56,333.67 | $41,499.00 |
| [Bank CD] | H | | | $27,864.46 | $0.00 |
| [Rental Bank #0898] | H | | $1,500.00 | $1,500.00 | |
| [Bank #8979 (checking)] | H | | $3,631.89 | $3,631.89 | |
| [Bank #0365] | H | | $22,252.64 | $22,252.64 | |
| [Bank #5854] | H | | $63,281.02 | $63,281.02 | |
| [Bank #7085] | W | | $350.00 | $350.00 | |
| [Bank #4262] | W | | $300.00 | $300.00 | |
| [Bank #7751] | H | | $29,532.00 | | |
| [Bank IRA #2422] | H | | $9,207.08 | $9,207.08 | |
| [Pension]* | H | | $248.00/mo. | $248.00/mo. | $248.00/mo. |

---

[3] All of the cells crossed-out in this table were crossed-out by hand on the original statement. At the bottom of each page of the statement was the following: "*Pre-marital asset."

| | OWNER | Agreed Recipient | Agreed Value | Values [Laura] | Values [Mark] |
|---|---|---|---|---|---|
| Shop Contents/Tools* | H | | | $50,000.00 | $25,000.00 |
| Guns & Safe* | H | | | $15,000.00 | $2,500.00 |
| Appliances | H | | | $5,000.00 | $1,000.00 |
| [Livestock] | H | | | $1,500.00 | $500.00 |
| | | | | | |
| **LIABILITIES** | **OWNER** | **Agreed Recipient** | **Agreed Value** | **Values [Laura]** | **Values [Mark]** |
| [2009 Federal Taxes] | W | | $11,642.00 | $11,642.00 | |
| Genesis | W | | | | |
| [2009 State Taxes] | W | | | $3,843.15 | $3,620.00 |
| [Misc. Medical Exps.] | W | | | $2,046.95 | |
| [Store] Credit Card | W | | | $50.00 | |
| [Tractor Bank Loan] | H | | | | $13,409.00 |
| Quad Corporation | W | | | $1,439.73 | |
| [CS] Recovery | W | | | $73.51 | |
| [Laura's Attorney's Fees] | W | | | $12,689.69 | |
| [Psych. Assoc.] | J | | | $196.00 | |
| [Bank Credit Card] | H | | | | 0.00 |
| | | | | | |

Mark filed a resistance to Laura's motion, as well as his own rule 1.904(2) motion. Mark requested, among many things, that the court amend its ruling to "base the property division on the agreed-upon values set forth by the parties['] . . . Joint Statement, subject to the evidence on [Bank] account balances submitted" into evidence at trial. He also requested the court amend the decree "to take into account the premarital nature" of assets designated as premarital on the statement. Additionally, he requested the court reevaluate its property distribution, reduce the income it attributed to him, and reduce the amount of the spousal support award accordingly.

The district court subsequently entered an order amending its original order and ruling. "Based on the values stated in" the parties' joint statement, the

court amended its valuations and distributions of assets in the following respects:[4]

| PETITIONER'S VALUES | Court's Value | Mark | Laura |
|---|---|---|---|
| [Homestead] | $255,300.00 | $127,650.00 | $127,650.00 |
| [Rental] | $190,970.00 | $152,776.00 | $38,194.00 |
| 2000 [car] | $2,000.00 | | $2,000.00 |
| **2011 [truck]** | *$20,900.00* | *$20,900.00* | |
| **[AMENDED VALUE]** | **$19,946.00** | **$19,946.00** | |
| **Boat & Trailer** | | *$1,500.00* | |
| **[AMENDED VALUE TO $3,000 & DESIGNATED PREMARITAL]** | | **$0.00** | |
| **Horse Trailer** | | *$500.00* | |
| **[AMENDED VALUE]** | | **$1,000.00** | |
| [Pick-up] | $1,500.00 | $1,500.00 | |
| **Work Trailer** | | *$350.00* | |
| **[AMENDED VALUE]** | | **$5,000.00** | |
| [CMFG Insurance] | $5,455.00 | $5,455.00 | |
| [NW Mutual Insurance] | $26,473.00 | $26,473.00 | |
| Prudential | | | |
| [BF] Stock | $56,333.67 | $56,333.67 | |
| [Bank] CD | $64,552.07 | $64,552.07 | |
| **[Bank] RENTAL DEPOSIT** | *$1,500.00* | *$1,500.00* | |
| **[REMOVED FROM ASSETS]** | **$0.00** | **$0.00** | |
| [Bank] | $14,847.77 | $14,847.77 | |
| [Bank] | | | $300.00 |
| *[Bank]* | *$63,221.12* | *$31,610.56* | *$31,610.56* |
| **[IDENTIFIED AS Bank #5854 & AMENDED VALUE]** | **$31,640.51[5]** | **$15,820.26** | **$15,820.26** |
| [Bank] | $1,500.00 | $750.00 | $1,500.00 |
| [Bank] | $29,532.00 | | |
| [Bank] | | | |
| [Bank] | | | |
| Guns & Safe | $2,300.00 | $2,300.00 | |

---

[4] A table was not included in the amended order, and we attempt to recreate one as best we can based upon the district court's amended numbers expressly stated in its order. All other figures are the values set out in the court's original order and ruling.

[5] The court found the proceeds from the sale of the Wisconsin property were deposited in Mark's Bank #5854 account and that account had a net value of $63,281.02. The court found half of that value to be the property of Mark's son. The remaining half was distributed equally between Mark and Laura.

| Shop Contents/Tools[6] | ~~$25,000.00~~ | ~~$25,000.00~~ | |
|---|---|---|---|
| [AMENDED VALUE TO $5,000 & DESIGNATED PREMARITAL] | | $0.00 | |
| Tractor | ~~$17,413.60~~ | ~~$17,413.60~~ | |
| [AMENDED VALUE] | $13,191.00 | $13,191.00 | |
| *Appliances* | ~~$1,500.00~~ | ~~$1,500.00~~ | |
| [AMENDED VALUE] | $2,500.00 | $2,500.00 | |
| Furniture | $5,000.00 | $5,000.00 | |
| [Livestock not included] | ~~$0.00~~ | ~~$0.00~~ | |
| [AS AMENDED] | | $1,000.00 | |
| [MARITAL DEBTS] | | -$20,000.00 | |
| *subtotal* [AS AMENDED] | | $496,094.77 | |
| [UNKNOWN ASSET] | | $59,320.89 | |
| | | | |
| [TOTAL AS AMENDED] | | $555,415.66[7] | $185,464.26 |

Mark appeals and Laura cross-appeals. We address their claims in turn.

## II. Discussion.

Because marriage dissolution proceedings are equitable proceedings, our review is de novo. *See* Iowa Code § 598.3 (2015); *In re Marriage of Mauer*, 874 N.W.2d 103, 106 (Iowa 2016). This requires us to "examine the entire record and adjudicate anew the issue of the property distribution." *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). Nevertheless, "[u]nder this standard, we defer to the factual findings of the district court," *In re Marriage of Kimbro*, 826 N.W.2d 696, 698 (Iowa 2013), "particularly concerning the credibility

---

[6] The court's original order and ruling valued "Shop contents" at $25,000, a value upon which the parties agreed. In its rule 1.904(2) ruling, the court stated: "The Shop and contents with a net value of $5000 are premarital assets of Mark and are awarded to him." From this language it appears the court reduced the value from $25,000 to $5000, but it is unclear. Laura's brief suggests the $5000 was in addition to the $25,000, but Mark's brief notes the court "found that the shop and its contents were worth $5000." In any event, Mark agrees the "[b]usiness asset" was marital property valued at $25,000.

[7] We cannot determine how the district court arrived at $555,415.66. The numbers in this column add up to $496,094.77, as we have indicated on the subtotal line above. We have simply referred to the difference as an "UNKNOWN ASSET" attributed to Mark of $59,320.89.

of witnesses; however, those findings are not binding upon us," *McDermott*, 827 N.W.2d at 676. We will only disturb a district court determination if there has been a failure to do equity. *See Mauer*, 874 N.W.2d at 106. However, we review an award of attorney fees for an abuse of discretion. *See In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006).

### A. Property Distribution, Valuations, and Equalization Payment.

Iowa Code section 598.21(5) requires marital property be divided equitably in dissolution-of-marriage cases. *See In re Marriage of Hansen*, 733 N.W.2d 683, 702 (Iowa 2007). This first requires a determination of which property is subject to division, and then, considering the factors set forth in section 598.21(5), that property must be divided equitably. *See In re Marriage of Fennelly*, 737 N.W.2d 97, 102 (Iowa 2007).

In determining which property is subject to division, we consider not only "property acquired during the marriage by one or both of the parties, but property owned prior to the marriage by a party," with the understanding that, under section 598.21, "property brought into the marriage by a party is merely a factor to consider by the court, together with all other factors, in exercising its role as an architect of an equitable distribution of property at the end of the marriage." *In re Marriage of Schriner*, 695 N.W.2d 493, 496 (Iowa 2005). Ultimately, any "[p]roperty not excluded is included in the divisible estate." *Id.*

"The partners in the marriage are entitled to a just and equitable share of the property accumulated through their joint efforts," *In re Marriage of Hazen*, 778 N.W.2d 55, 59 (Iowa Ct. App. 2009), but it "is important to remember marriage does not come with a ledger," *Fennelly*, 737 N.W.2d at 103. In determining how

to equitably divide the property, an "equitable division is not necessarily an equal division." *Hansen*, 733 N.W.2d at 702. Though "it is generally recognized that equality is often most equitable," *Fennelly*, 737 N.W.2d at 102, "[e]quitable distribution depends upon the circumstances of each case," *Hansen*, 733 N.W.2d at 702. Consequently, precedent is of little value. *See McDermott*, 827 N.W.2d at 682. "[K]eeping in mind there are no hard and fast rules governing economic issues in dissolution actions," we must apply the factors contained in section 598.21(5) in reaching an equitable division. *Id.*

### 1. Undisputed Claims, Valuations, and Division.

The parties do not challenge the district court's valuation and division of the following marital assets:

| Asset | Valuation | Mark $ | Laura $ |
| --- | --- | --- | --- |
| Homestead | $255,300.00 | $255,300.00 | $0.00 |
| 2000 car | $2,000.00 | $0.00 | $2,000.00 |
| 2011 truck[8] | $19,946.00 | $19,946.00 | $0.00 |
| Pick-up | $1,500.00 | $1,500.00 | $0.00 |
| Prudential | $0.00 | $0.00 | $0.00 |
| Tractor [net value][9] | $13,191.00 | $13,191.00 | $0.00 |
| Rental Bank #0898[10] | $0.00 | $0.00 | $0.00 |
| Laura's Bank #4262 | $300.00 | $0.00 | $300.00 |
| Boat & Trailer | $3000.00 | $0.00 | $0.00 |

Additionally, the parties agree the court should have valued Mark's stock at $41,499, not $56,333.67, based upon the evidence at trial. The parties further

---

[8] Though Mark's brief states the value of this truck was $19,956, the parties' joint statement shows Mark agreed it was valued at $19,946. Laura does not dispute this value, so we do not modify it.

[9] The parties agree the value of the tractor is $26,600, with a lien of $13,409 and thus has a net value of $13,191. Because we use the net value we do not include the lien in the liabilities part of the equation.

[10] The parties agree this account holds the rental deposit required by statute and is not marital property. We list it only to show we give it no value in the division.

agree the court inadvertently omitted Laura's second bank account, Bank #7085, and they agree its value is $350. They also agree Mark's Bank #8979 account is marital property valued at $3631.89.[11] Finally, they agree the shop and its contents are marital property valued at $25,000. Insofar as the district court found otherwise, we modify these valuations and allocate as follows:

| Assets | Valuation | Mark $ | Laura $ |
|---|---|---|---|
| BF Stock | $41,499.00 | $41,499.00 | $0.00 |
| Laura's Bank #7085 | $350.00 | $0.00 | $350.00 |
| Bank #8979 | $3,631.89 | $3,631.89 | $0.00 |
| Shop Contents/Tools | $25,000.00 | $25,000.00 | $0.00 |

The parties also basically agree on the valuations of two of Mark's other accounts, Bank #7751 and Bank #2422. Their valuations of the accounts differ by a few dollars. We use the valuations that match the balances reflected on the statement Mark provided at trial. Accordingly, insofar as the district court found otherwise, we modify these valuations and allocate as follows:

| Assets | Valuation | Mark $ | Laura $ |
|---|---|---|---|
| Bank #7751 | $29,532.76 | $29,532.76 | $0.00 |
| Bank #2422 | $9,211.77 | $9,211.77 | $0.00 |

Finally, the parties agree the court should have ordered Laura to quitclaim her interest in the real property to Mark upon payment of the property settlement. Accordingly, we modify the decree to order that Laura quitclaim her interest in the real property to Mark upon payment of the property settlement.

### 2. *Disputed Valuations and Property Division*.

An agreement between the parties resolving issues in domestic-relations cases is generally considered valid. *See In re Marriage of Briddle*, 756 N.W.2d

---

[11] Mark's Bank #8979 account had a balance of $3632.03 at the time of trial, fourteen cents higher than the parties' agreed amount. We use the parties' agreed valuation.

35, 40 (Iowa 2008). Nevertheless, the trial court retains "the power to reject the parties' stipulation if it is unfair or contrary to law." *Id.* Though, the "validity of the solutions reached in the . . . agreement need not be those the court itself would have adopted if it were adjudicating the controversy," *id.* at 41, the trial court must determine if the parties' stipulation "constitute[s] an appropriate and legally approved method of disposing of the contested issues," *In re Marriage of Jones*, 653 N.W.2d 589, 593 (Iowa 2002).

"Valuation is difficult and trial courts are given considerable leeway in resolving disputes as to valuations." *In re Marriage of Shanks*, 805 N.W.2d 175, 177 (Iowa Ct. App. 2011). "Ordinarily, a trial court's valuation will not be disturbed when it is within the range of permissible evidence." *Hansen*, 733 N.W.2d at 703. Even though our review is de novo, we generally "defer to the trial court when valuations are accompanied by supporting credibility findings or corroborating evidence." *Id.* Yet, because our review is de novo, we may make our own findings and conclusions on issues properly raised but not decided by the district court. *See Lessenger v. Lessenger*, 156 N.W.2d 845, 846 (Iowa 1968) (noting our review of an equity case is de novo where we may issue fact findings and legal conclusions on our own review as we deem proper). Stated another way, because our review is de novo, we need not ascertain the intent of the district court but conduct our own "review of the statutory factors relevant to an equitable distribution of marital property." *In re Marriage of Rhinehart*, 704 N.W.2d 677, 683 (Iowa 2005). We note that the owner of the property is considered "a competent witness to testify to its market value." *Hansen*, 733 N.W.2d at 703. Additionally, while we recognize that, generally, the value of the

assets should be determined as of the date of trial, there may be occasions when the trial date is not appropriate to determine values. *See In re Marriage of Driscoll*, 563 N.W.2d 640, 642 (Iowa Ct. App. 1997). This is because equitable distributions require flexibility and concrete rules of distribution may frustrate the court's goal of obtaining equitable results. *See id.* Dissipation of assets is also a proper consideration in dividing property. *See Fennelly*, 737 N.W.2d at 104.

### a. Remaining Bank Accounts.

Excluding the accounts addressed above, three other accounts were listed on the parties' joint statement: Bank CD, Bank #0365, and Bank #5854. Though the parties' joint statement listed several agreed-upon balances, the court verified at the beginning of the trial that the balances might be modified "once the evidence is received." At trial, Mark provided a February 23, 2015 balance report from Bank, which he testified showed "all of the current values of everything [he had] with [Bank]." The report listed the following relevant accounts:

| Product | Account Number | Current Balance |
|---|---|---|
| [SB Checking] | [Bank #0365] | $17,555.51 |
| [PMM Savings] | [Bank #5854] | $63,292.56 |
| [P3I] | [Bank #9732] | $0.00 |

### i. Bank CD.

None of the accounts on the report provided by Mark were specifically labeled as a CD, nor was there any testimony stating which account, if any, was a CD account. The joint statement provided by the parties had Bank CD listed, but that account was crossed out or struck through, indicating this account either no longer existed or had no value. We therefore modify its valuation to zero as follows:

| Assets | Valuation | Mark $ | Laura $ |
|---|---|---|---|
| Bank CD | $0.00 | $0.00 | $0.00 |

### ii. Bank #9732.

The report listing Mark's bank accounts and balances show his Bank #9732 brokerage account had a zero balance at the time of trial. However, on cross-examination, Mark admitted that when he answered interrogatories the Bank #9732 account's balance was approximately $27,000. When asked what had happened to the $27,000, Mark was not sure, testifying: "I'm confused on that. I don't know. Me and [my attorney] had it worked out, and everything was correct. I don't know what to tell you on that other than I'm sure he can get you the answer for that." Mark provided his Bank #9732 statement for the month of February 2014, which showed a beginning balance of $73,832.92 and an ending balance of $0. He also provided another statement for Bank #5854 for the period of February 21 to March 19, 2014, showing a beginning balance of $1248.70, and an ending balance of $78,202.57. The statement shows a deposit of $76,948.07 was made February 25, 2014. Mark was asked if he transferred the funds from Bank #9732 to Bank #5854, and he testified: "It appears I did, but I do not remember that, but yes." Mark's counsel asked:

> Q. Okay. Well, didn't you have some issues with your holdings at [Bank], and you were not satisfied— A. Oh, yeah.
> Q. —with how they were going? A. Yeah. My investor, yes.
> Q. And so you moved them somewhere else? A. Okay.
> Q. Is that your recollection? A. Yes, sir.

The court then attempted to clarify, and the following exchange occurred:

> THE COURT: Counsel, I'm gonna stop and ask for some clarification because I am hopelessly confused.[12]

---

[12] Perfectly understandable in our judgment.

[MARK'S COUNSEL]: Okay.

THE COURT: We have an account from which the money is transferred. That's the money coming out, and I think you've established that that [is the Bank #9732 account]. And in February, approximately $76,000 comes out of that account.

[MARK'S COUNSEL]: I believe that is correct.

THE COURT: But you've given me two different account numbers into which that money goes in.

[MARK'S COUNSEL]: Okay. And I apologize for that, Your Honor. The problem is that [Bank] does this uniform statement, and it puts two accounts on the same statement. So the statement that I just put in front of him, [Exhibit] AA, is this uniform statement with both the personal checking account, which is—I better get this right—

[LAURA'S COUNSEL]: I know what it is. [Bank #8979] is the account number which is—contains his personal platinum checking and a money market savings account. So what he did was he took it out of, allegedly, [Bank #9732] and deposited it into [Bank #8979] in the money market portion of the account.

[MARK'S COUNSEL]: That is what I'm trying to establish, yes.

[LAURA'S COUNSEL]: Right. The problem that I see is the balance which now he says he has in [Bank #8979] of $63,000, in July he said he had that plus another $27,000 back in [Bank #9732].

[MARK'S COUNSEL]: Right. So the problem that we have is this [interrogatory] answer regarding [Bank #9732]. And that was what you were trying to get at. And I have just established that there was a lot—

THE COURT: Let's go off the record here. (Off-the-record discussion.)

THE COURT: Where are we with the issue of [the Bank exhibits], counsel?

[MARK'S COUNSEL]: Your Honor, we had a discussion off the record and would like to request, since we can't clarify this discrepancy between the interrogatory answer and the statements, that I have to request to keep the record open at the close of testimony and produce the statements from the [exhibits] that I gave on this account up until . . . the date of this dissolution.

Laura did not object.

After trial, Mark submitted a letter prepared by Bank stating: "In regards to [Bank #9732] belonging to [Mark], this account was liquidated on 02/25/2014 and was moved to his linked checking account ending in X5894." This letter did

nothing to clear the muddy waters. No checking account ending in X5894 appears on the Bank's report listing Mark's accounts and their corresponding balances. The Bank's report does identify Bank #5854 as a money market savings account, but the Bank's letter specifically states the account ending in X5894 is a "linked checking account." Consequently, we cannot conclude with any certainty that the Bank's identification of the account as ending in X5894 was a typographical error by Bank.

In any event, Mark admitted he had had $27,000 in his account which he could not account for. He was given an extra opportunity to reconcile the evidence. On our de novo review of the evidence, we find it would be inappropriate to use the balance of the account at the date of trial—$0—as the account's valuation. Accordingly, $27,000 should be included as marital property and we modify as follows:

| Assets | Valuation | Mark $ | Laura $ |
|---|---|---|---|
| Bank #9732 | $27,000.00 | $27,000.00 | $0.00 |

### iii. Bank #0365—Business Account.

Mark's Bank #0365 account is his business account, and at the time of trial, its balance was $17,551.51. However, at the time of the parties' joint statement, Mark admitted it had a balance of $22,252.64, a difference of $4697.13. He argues the account should be valued at the lesser figure, while Laura asserts it should be valued at the higher number.

Mark testified he had paid property taxes of approximately $3000 from the account, but he admitted he had not yet deposited checks the business had received for February 2015 sales. He did not give an accounting for the amount

of the checks to be deposited, but he testified the balance for the account could have been "maybe 6 or $7,000 [higher], counting the $3,000 [property tax payment] and the checks that I have for this month." Because Mark believed he had $3000 or $4000 that had not yet been deposited into his account, we believe the parties' stipulated balance of $22,252.64 represents the fair valuation of Mark's Bank #0365 account, not the balance of the account on the date of trial. Accordingly, we modify as follows:

| Assets | Valuation | Mark $ | Laura $ |
|---|---|---|---|
| Bank #0365 | $22,252.64 | $22,252.64 | $0.00 |

### iv. Bank #5854 and Wisconsin Property Proceeds.

At the time the parties entered into their stipulation, the parties agreed Mark's Bank #5854 account had a balance of $63,281.02, but they disputed what percentage of that valuation should be considered marital property and included in the property distribution equation. At trial, Mark testified that before he married Laura, his mother gave him a parcel of property she owned in Wisconsin. Mark "figured someday [he] would give [the property] to [his son]," so when the property was transferred from his mother, Mark titled the property jointly with his son. Mark and his son sold the property in 2004 and received net proceeds of $75,416.45 from the sale. Mark testified he put all of the sale proceeds into his Bank #5854 account and argued that, because half of the sale proceeds belonged to his son, only half of the account's value, $31,640.51, should be included in the property division. The district court agreed with Mark in its ruling on the parties' motions to amend and enlarge, finding "[h]alf of that value is the

property of Mark's son," and it appears to have distributed the remaining half between Mark and Laura.

Laura argued Bank #5854 should be considered marital property and 100% of its balance included in the property division equation. She believed Mark was attempting to improperly set aside assets rightly belonging to the couple, pointing out it had been over eleven years since the sale, and Mark had purportedly not turned over any of these funds to his son. She also noted Mark admitted the property's value at the time of their marriage was only $17,900, and they paid taxes on and made improvements to the property during the marriage.

Upon our de novo review, we agree with Laura that the entire valuation should be included in the property division equation. As we noted in our discussion of the value of Mark's Bank #9732 account, he provided his statement for his Bank #5854 account for the period of February 21 to March 19, 2014, which had a beginning balance of $1248.70. Though we have no doubt his son was entitled to half of the sale proceeds of the Wisconsin property, Mark has failed to establish the money in his Bank #5854 account is the same money he received from the sale of the Wisconsin property over eleven years ago. Therefore, the entire balance of the account should be included as marital property. Accordingly, we modify as follows:

| Assets | Valuation | Mark $ | Laura $ |
|---|---|---|---|
| Bank #5854 | $63,281.02 | $63,281.02 | $0.00 |

### b. Log Cabin Rental Property.

The parties agree with the district court's total valuation of the log cabin rental property at $190,970, but they disagree with the court's division of the

asset. Mark contends the court did not err in determining 60% of the property's value should be set aside as premarital property and not included in the property distribution equation, but he argues the district court failed to carry out that determination in its calculation. Laura argues the entire valuation should be included in the calculation.

Mark testified he took ownership of the property in 1978 and built the cabin on the land the same year. Thus, he owned this property twenty years before the parties' marriage in 1998. The parties then lived there after their marriage until they moved in 2005. Laura testified not many improvements were made to the property while she lived there with Mark, but they did put a roof on it and did a lot of dirt work and blacktop, "stuff like that." She also testified that after they moved, they decided to rent out the property and made improvements, such as adding new vinyl, carpet, paint, and stain.

The district court found "Laura has a 20% marital interest in the rental property," explaining that though the property "was purchased and paid for by Mark prior to the marriage" and "marital funds were used to remodel and update that property from time to time." It allocated $38,194 in Laura's column, representing 20% of the $190,970 valuation, but it appears to have included the remaining 80% of the valuation in Mark's column and, therefore, included all of the asset's value in its marital estate calculation.

On our de novo review, we have considered the applicable section 598.21(5) factors in this case—including but not limited to the length of the parties' marriage, as well as each party's age, health, earning capacity, premarital property, contribution to the marriage and to the other's increased

earning power, and other economic circumstances—and we find the district court's division of the property's value to be inequitable. Mark owned the property for twenty years before he married Laura, and then another sixteen years during the marriage. Twenty of thirty-six years is 55%, and the remaining sixteen of thirty-six years is 45%. Taking the valuation of $190,970 times 55%, we conclude equity requires $105,033.50 of the asset be set aside as Mark's premarital property and not included in the division. The difference of $85,936.50, or 45%, should be included as a marital asset. We therefore modify the valuation for purposes of the division of the asset as follows:

| Assets | Valuation | Mark $ | Laura $ |
|---|---|---|---|
| Log Cabin Rental Property | $85,936.50 | $85,936.50 | $0.00 |

### c. Remaining Property.

Mark disputes the court's valuations of his work trailer, guns, appliances, furniture, and livestock. He argues that "as the owner of such property, he was competent to credibly set its value." However, the work trailer, appliances, furniture, and livestock were marital property owned by both parties, and Laura was also a competent witness to set their valuations. Concerning the value of Mark's guns, the court assigned the line item "guns and safe" a value of $2300. Mark asserts on appeal the value of his guns was $1200, but he does not give any valuation of the safes' contents. Moreover, Mark himself valued the items together on the parties' joint statement at $2500. Reviewing the record de novo, we find the district court's valuations of all of these items to be within the range of evidence presented and therefore do not disturb these valuations.

Mark also disputes the court's inclusion of the value of his horse trailer in the distribution equation, noting the parties stipulated the item was premarital property. He also argues the entirety of the value of his two insurance policies should not be included in the division. He asks that only the difference in the policies' values between 1998 and the current valuation be used as the value for the policies. Considering all of the relevant factors, including that these items were Mark's property prior to the marriage, we agree with the district court that equity requires these values be included in their entirety in the property distribution equation. Accordingly, we affirm these valuations and the allocation of each asset as follows:

| Assets | Valuation | Mark $ | Laura $ |
| --- | --- | --- | --- |
| Work Trailer | $5,000.00 | $5,000.00 | $0.00 |
| Horse Trailer | $1,000.00 | $1,000.00 | $0.00 |
| Guns & Safe | $2,300.00 | $2,300.00 | $0.00 |
| Appliances | $2,500.00 | $2,500.00 | $0.00 |
| Furniture | $5,000.00 | $5,000.00 | $0.00 |
| Livestock | $1,000.00 | $1,000.00 | $0.00 |
| NW Mutual Insurance | $26,473.00 | $26,473.00 | $0.00 |
| CMFG Insurance | $5,455.00 | $5,455.00 | $0.00 |

### 3. Property Distribution Summary.

Concerning the liabilities to offset the marital estate, the parties do not challenge the district court's inclusion of $20,000 as the value of the marital debt. Based upon all of the valuations above, we reconcile the total as follows:

| Asset | Valuation | Mark $ | Laura $ |
| --- | --- | --- | --- |
| Homestead | $255,300.00 | $255,300.00 | $0.00 |
| Log Cabin Rental Property | $85,936.50 | $85,936.50 | $0.00 |
| 2000 car | $2,000.00 | $0.00 | $2,000.00 |
| 2011 truck | $19,946.00 | $19,946.00 | $0.00 |
| Boat & Trailer (not included) | $0.00 | $0.00 | $0.00 |

| | | | |
|---|---|---|---|
| Tractor | $13,191.00 | $13,191.00 | $0.00 |
| Horse Trailer | $1,000.00 | $1,000.00 | $0.00 |
| Pick-up | $1,500.00 | $1,500.00 | $0.00 |
| Work Trailer | $5,000.00 | $5,000.00 | $0.00 |
| CMFG Insurance | $5,455.00 | $5,455.00 | $0.00 |
| NW Mutual Insurance | $26,473.00 | $26,473.00 | $0.00 |
| Prudential | $0.00 | $0.00 | $0.00 |
| BF Stock | $41,499.00 | $41,499.00 | $0.00 |
| Bank CD | $0.00 | $0.00 | $0.00 |
| Rental Bank #0898[13] | $0.00 | $0.00 | $0.00 |
| Bank #8979 | $3,631.89 | $3,631.89 | $0.00 |
| Bank #0365 | $22,252.64 | $22,252.64 | $0.00 |
| Bank #5854 | $63,281.02 | $63,281.02 | $0.00 |
| Laura's Bank #7085 | $350.00 | $0.00 | $350.00 |
| Laura's Bank #4262 | $300.00 | $0.00 | $300.00 |
| Bank #7751 | $29,532.76 | $29,532.76 | $0.00 |
| Bank #2422 | $9211.77 | $9211.77 | $0.00 |
| Bank #9732 | $27,000.00 | $27,000.00 | $0.00 |
| Shop Contents/Tools | $25,000.00 | $25,000.00 | $0.00 |
| Guns & Safe | $2,300.00 | $2,300.00 | $0.00 |
| Appliances | $2,500.00 | $2,500.00 | $0.00 |
| Livestock | $1,000.00 | $1,000.00 | $0.00 |
| Furniture | $5,000.00 | $5,000.00 | $0.00 |
| ***Asset Subtotal*** | $648,660.58 | $646,010.58 | $2,650.00 |
| Marital Debt | $20,000.00 | $20,000.00 | $0.00 |

| | |
|---|---|
| **Marital Estate (Difference)** | **$628,660.58** |
| | |
| Half Marital Estate | $314,330.29 |
| Less Property in Laura's Possession | $2,650.00 |
| Equalization Payment Due | $311,680.29 |

Accordingly, we modify Mark's equalization payment to Laura to $311,680.29.

---

[13] The parties agree this account holds the rental deposit required by statute and is not marital property. We list it only to show we give it no value in the division.

### B. *Mark's Remaining Claims*.

### 1. *Spousal Support*.

"Whether spousal support is justified is dependent on the facts of each case." *Shanks*, 805 N.W.2d at 178. Though not mandated, the district court may order spousal support be paid if it determines support payments are warranted after considering all of the following factors together:

> a. The length of the marriage.
> b. The age and physical and emotional health of the parties.
> c. The distribution of property made pursuant to section 598.21.
> d. The educational level of each party at the time of marriage and at the time the action is commenced.
> e. The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, responsibilities for children under either an award of custody or physical care, and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.
> f. The feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal.
> g. The tax consequences to each party.
> . . . .
> j. Other factors the court may determine to be relevant in an individual case.

Iowa Code § 598.21A(1); *see also In re Marriage of Gust*, 858 N.W.2d 402, 407 (Iowa 2015); *Shanks*, 805 N.W.2d at 178. The trial court is "in the best position to balance the parties' needs, and [appellate courts] should intervene . . . only where there is a failure to do equity." *Gust*, 858 N.W.2d at 416.

Here, the parties were married for over sixteen years. At the time of the parties' marriage in 1998, Mark was unemployed. Laura "had been on disability for four years when [they] married," having been diagnosed with chronic fatigue

syndrome, and her only sources of income at the time of the marriage were social security disability and private disability insurance. After they married, Mark started and continued to grow his own small engine repair business. Laura performed bookkeeping for the business and answered its phone for a period of time.

In 2000, Laura had surgery on her back to alleviate some of her medical conditions. Ultimately, the surgery was not only unsuccessful, it increased Laura's pain and required physical therapy thereafter. At the time of trial, Laura had numerous medical conditions requiring medication.

At trial, the parties' 2013 joint federal tax return was submitted as evidence. That return shows Mark reported an adjusted gross income of $18,015. Schedule C of the return reported Mark's business had gross sales or receipts of $54,870; gross income of $36,819; total expenses of $35,198; and a net profit of $1621, which is included in the adjusted gross income. Laura also submitted the Schedule C of the parties' 2011 federal tax return, which reported Mark's business had gross sales or receipts of $54,400; gross income of $29,695; total expenses of $22,720; and a net profit of $6975.

The parties agreed that at the time of trial, Laura's gross income was $13,260 annually. However, Mark's income was disputed. Mark's financial affidavit stated his gross income was $36,174 per year. At trial, Laura testified Mark "kept a lot of cash out of the business when customers would pay him that way," but she was unsure of the amount because she "never saw the cash tickets." Laura testified Mark kept cash in one of the safes, but she did not have access to the safe to total the cash. She also testified Mark "always had

thousands of dollars on him." Mark denied failing to report all of the cash he received, and he testified his business was paid in cash only approximately 10% of the time. He testified he only kept between $500 and $600 of petty cash.

Additionally, Laura submitted as evidence of Mark's income a copy of an October 2013 "Note and Security Agreement with Guaranty" Mark executed in obtaining a loan with Bank for the purchase of the tractor. That document stated Mark's "Gross Annual Sales" were $100,000. Mark admitted that was what the document stated, but he testified he did not "remember telling them $100,000, but [he] didn't really fill [the form] out." Mark also received income from the rental property of $12,600 per year, but he testified he expected to sell the property to pay for the property settlement, so he did not expect to continue receiving this income after the dissolution.

In its decree, the district court found "[t]he parties most current income tax returns show that Mark earns approximately $92,000, and Laura $22,500 per year in gross income." The court found Laura should receive spousal support

> based on all the statutory factors . . . and considering the parties' medical conditions and ability to earn income . . . . Further, Laura has no ability to earn income from her own efforts and her sole means of support, the $1100 per month she receives in disability benefits, cannot maintain her in any meaningful level of comfort relative to her lifestyle during the marriage. Mark can work and his ability to earn an income is not significantly reduced by his current conditions, including his health and age.

The court first used the guidelines suggested in *Gust*, though it acknowledged the *Gust* guidelines contemplated marriages of over twenty years' duration. *See Gust*, 858 N.W.2d at 416 n.2 ("The [American Academy of Matrimonial Lawyers (AAML)] urges a guideline approach where marriages over twenty years qualify

for unlimited spousal support."). The court determined 30% of Mark's income of $92,000 to be $27,600, and subtracted 20% of Laura's income of $22,500, or $4500, from that amount to reach the figure of $23,100. *See id.* ("The amount of unlimited spousal support is determined by taking 30% of the payor's gross income minus 20% of the payee's gross income."). Dividing $23,100 by twelve, the court found "the *Gust* guidelines for support would result in Mark owing Laura a permanent support award of in excess of $1900 per month."[14] The court reduced the amount and ordered that Mark pay to Laura permanent spousal support of $1100 per month.

On appeal, Mark challenges the district court's finding that he earned $92,000 per year, arguing the evidence only supported that he earned about $38,400 annually, and he suggests the court's figure was inadvertently copied from the *Gust* opinion, where the supreme court found that exact figure in its income determination. *See id.* at 415 ("Steven, on the other hand, earns $92,000 per year."). Mark disputed his income in his rule 1.904(2) motion, but the court did not modify his income. It did, however, at Laura's request, reduce her income to $13,200 annually.

---

[14] In *Gust*, 858 N.W.2d at 416 n.2, our supreme court suggested the AAML guidelines might "provide a useful reality check with respect to an award of traditional alimony." Later, the court explained it did not use the AAML guidelines to determine whether the spousal support award in *Gust* was equitable—it "used the section 598.21A(1) factors and principles suggesting the comparative weight of those factors derived from our relevant caselaw," and its resolution "of a spousal support issue was consistent with the presumptive result under the AAML guidelines." *Mauer*, 874 N.W.2d at 109. The court cautioned that "the AAML guidelines are not Iowa law and therefore clearly not binding on Iowa courts." *Id.* at 108. The court made it clear that "any court, including our appellate courts, must apply the section 598.21A(1) factors in making spousal support determinations." *Id.* at 109. It now appears the *Gust* footnote was a mere aside and easily misconstrued. We note the *Mauer* clarification was filed in January 2016—long after the district court entered its order and ruling.

Here, we agree with the district court that spousal support is justified, and Mark does not contest this. Mark has substantially supported the parties during their sixteen-year marriage. Upon our de novo review—taking into account the income from the rental property, reported business earnings, dividends, Laura's testimony of Mark's unreported earnings, and his income as stated on the security agreement—we find the evidence supports the determination that Mark's earning capacity is at least $52,000 per year.[15] Considering all of the relevant section 598.21A(1) factors—including but not limited to the parties' ages, health conditions, and disparate income earning abilities, along with the length of the marriage and the property distribution above—we conclude the district court's monthly spousal support award of $1100 per month is both compatible with the requirements of section 598.21A(1) and equitable. Accordingly, we affirm the district court's award.

### 2. Trial Attorney Fees.

Mark contends the district court abused its discretion when it ordered him to pay $12,000 of Laura's trial attorney fees. "[W]e give the district court considerable discretion in determining whether it should award fees at the district court level." *In re Marriage of Michael*, 839 N.W.2d 630, 639 (Iowa 2013). An abuse of discretion occurs when the district court exercises its discretion "on grounds or for reasons that are clearly untenable or to an extent clearly unreasonable." *State v. Nelson*, 791 N.W.2d 414, 419 (Iowa 2010); *Graber v. City of Ankeny*, 616 N.W.2d 633, 638 (Iowa 2000).

---

[15] We recognize Mark testified he planned to sell the property, but no evidence beyond this was provided in support of his claim.

Upon our review, we find the award reasonable and therefore find the district court did not abuse its discretion. Accordingly, we affirm on this issue.

### C. Laura's Remaining Claims.

### 1. Life Insurance Policy.

Laura argues the district court should have required Mark to secure his spousal support obligations with life insurance. Generally, the permanent spousal support award terminates upon the death of either party. *See Gust*, 858 N.W.2d at 412; *In re Marriage of Lytle*, 475 N.W.2d 11, 12 (Iowa Ct. App. 1991); *In re Marriage of Hayne*, 334 N.W.2d 347, 352 (Iowa Ct. App. 1983). However, a requirement to maintain life insurance to secure spousal support is permissible. *See In re Marriage of Olson*, 705 N.W.2d 312, 318 (Iowa 2005); *In re Marriage of Weinberger*, 507 N.W.2d 733, 736 (Iowa Ct. App. 1993); *see also Stackhouse v. Russell*, 447 N.W.2d 124, 125 (Iowa 1989) ("A provision in a dissolution of marriage decree to maintain life insurance is enforceable."). If the party requesting the security has demonstrated a need and the cost of such a policy would not be unduly burdensome, the court may order the security of a life insurance policy. *See Olson*, 705 N.W.2d at 318; *see also In re Marriage of Muow*, 561 N.W.2d 100, 102 (Iowa Ct. App. 1997); *In re Marriage of Stepanek*, No. 13-1592, 2014 WL 4937435, at *3 (Iowa Ct. App. Oct. 1, 2014).

Upon our de novo review, we find Laura has not demonstrated a clear need for continued support such that Mark must secure her support after his death. Laura has been awarded a substantial equalization payment by way of the property division. Wise preservation and investment of the payment should be sufficient to enable her to subsist in reasonable comfort, even if Mark should

predecease her. Accordingly, we affirm the district court's declination to require Mark carry life insurance to secure his spousal support obligations after his death.

## 2. *Hold-Harmless Clause.*

Laura also asserts the district court should have ordered "that Mark hold Laura harmless with regard to any liability arising from income tax returns filed with Mark during the course of the marriage." However, given that the returns were filed jointly, we decline to include this clause. We therefore affirm the district court on this issue.

## 3. *Additional Time.*

At trial, Laura requested ninety days to remove any household goods awarded to her in the decree, testifying she could not "do very much at one time." The district court declined her request, noting she had "been well aware that this marriage was ending for some months and has had ample opportunity to remove her property prior to the entry of this decree. Extending her rights to the home farm will only exacerbate the conflicts between these parties." In her rule 1.904(2) motion, Laura asked for thirty days from the date she receives payment of the property settlement to remove her personal property and possessions from the former marital residence and property, but the court denied her request.

On appeal, Laura again asks for thirty days from the date she receives payment from Mark to pick up her property, explaining her health does not allow her to move her personal items herself and she has limited financial means to hire others to do so until she receives the payment. In response, Mark stated he had set aside the items Laura wanted from the marital home and stored them in

the garage to await Laura's pick up. He also stated he "remains willing to allow Laura to pick up her items, but there is no reason for her to have unfettered access to the marital home."

Here, Mark has agreed Laura may come pick up her property, and there is no reason not to give her thirty days to do so. If all of her property is set aside in the garage, we modify the decree to allow Laura thirty days after receiving the settlement payment to pick up her property from the garage, with no other access to the marital home, unless the parties agree otherwise. If all of Laura's property as awarded is not in the garage, we modify the decree to allow Laura thirty days after receiving the settlement to pick up her items from the garage and, with advance notice to Mark, from the marital home without otherwise disturbing the home, unless the parties otherwise agree.

### 4. Appellate Attorney Fees.

Finally, Laura requests an award of appellate attorney fees. Appellate attorney fees are discretionary, not a matter of right, and we consider the requesting party's need, the ability of the other party to pay, as well as the appeal's relative merits in deciding whether to award such fees. *See McDermott*, 827 N.W.2d at 687. Here, both parties advanced successful and unsuccessful claims. Considering the relevant factors, we decline Laura's request for appellate attorney fees in this appeal.

### III. Conclusion.

For the reasons discussed above, we modify Mark's equalization payment to Laura to $311,680.29, give Laura thirty days to remove her property as set out above, and order Laura to quitclaim her interest in the real property to Mark upon

payment of the property settlement.  We affirm the decree in all other respects.

Costs on appeal shall be taxed one-half to Mark and one-half to Laura.

**AFFIRMED AS MODIFIED.**